FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2009 MAR -4  P 4: 51

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. DAVID M. KAMMERER, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Action. No. 05-11519-RGS |
| OMNICARE, INC., and IVAX PHARMACEUTICALS, INC., | ) ) ) | **FILED UNDER SEAL** |
| Defendant. | ) ) ) |  |

## COMPLAINT OF THE UNITED STATES

This is an action to recover treble damages, restitution, and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and the common law for the submission of false claims to federal health care programs as a result of $8 million in kickbacks that defendant IVAX Pharmaceuticals, Inc., a generic drug manufacturer, paid to induce defendant Omnicare, Inc., a large nursing home pharmacy, to purchase and to recommend drugs from IVAX in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b).

### Jurisdiction and Venue

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1345. The Court has supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) because the defendants transact business in

this District and because the defendants submitted, caused to be submitted, or conspired to submit false claims in this District.

## The Parties

2.      Plaintiff United States, acting through the Department of Health and Human Services, administers Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. (Medicaid).

3.      Relator David Kammerer is a resident of Ohio.

4.      Defendant Omnicare, Inc. ("Omnicare"), is a Delaware corporation with headquarters in Covington, Kentucky. Omnicare is the nation's largest provider of pharmacy services to nursing homes and other long-term care facilities. It provides services to approximately 1.4 million long-term care residents in 47 states, including Massachusetts. Omnicare's principal business is to fill prescriptions and to deliver drugs to patients in long term care facilities. As part of that business, Omnicare employs pharmacists who make recommendations to nursing home physicians about the drugs they should prescribe for their patients. In many cases, these recommendations are a product of business deals that Omnicare has struck with particular drug manufacturers. Thus, when Omnicare enters into a remunerative contract with one drug manufacturer, Omnicare then directs its pharmacists to recommend that physicians prescribe more of that manufacturer's drugs, either by writing new prescriptions or by agreeing that Omnicare can switch their patients' existing prescriptions to the drugs of the manufacturer with which Omnicare has a contract.

2

5.     Defendant IVAX Pharmaceuticals, Inc. ("IVAX"), a Florida corporation formerly

known as Zenith Goldline Pharmaceuticals, Inc., is a generic drug manufacturer.  In 2006, IVAX

became a subsidiary of another generic drug manufacturer, Teva Pharmaceuticals, Ltd., an Israeli

entity.

## **Legal Background**

6.     The False Claims Act provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to
> an officer or employee of the United States Government or a member
> of the Armed Forces of the United States a false or fraudulent claim
> for payment or approval; (2) knowingly makes, uses, or causes to be
> made or used, a false record or statement to get a false or fraudulent
> claim paid or approved by the Government; [or] (3) conspires to
> defraud the Government by getting a false or fraudulent claim allowed
> or paid  . . .
>
> is liable to the United States Government for a civil penalty of
> not less than $5,000 and not more than $10,000, plus 3 times
> the amount of damages which the Government sustains
> because of the act of that person. . . .

                          *   *   *

> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in
> deliberate ignorance of the truth or falsity of the information;
> or (3) acts in reckless disregard of the truth or falsity of the
> information,
>
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

7.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to

$11,000 for violations occurring on or after September 29, 1999.

      8.      The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of

congressional concern that remuneration and gifts given to those who can influence healthcare

decisions would result in goods and services being provided that are medically unnecessary, of

poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the

Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the

payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the statute in

1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its

reach.  See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42

U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142;

Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

      9.      The anti-kickback statute prohibits any person or entity from offering, making,

soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or

reward any person for purchasing, ordering, or recommending or arranging for the purchasing or

ordering of federally-funded medical goods or services:

     (b) Illegal remunerations

        (1) whoever knowingly and willfully solicits or receives any remuneration (including
        any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
        kind--
           (A) in return for referring an individual to a person for the furnishing or arranging
           for the furnishing of any item or service for which payment may be made in
           whole or in part under a Federal health care program, or

4

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute also can subject the perpetrator to exclusion

from participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C.

§ 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

## Omnicare's Relationship With Medicaid

10.    During the period relevant here, from 2000 through 2004, after Omnicare

delivered drugs to patients in long term care facilities, it submitted reimbursement claims on

behalf of those patients to their insurers, including Medicaid.

11.    Medicaid is a joint federal-state program that provides health care benefits for

certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid

payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the

state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

12.     The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and to process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs, which in turn obtain federal funds from the United States.

13.     Omnicare is a party to provider agreements with each of the state Medicaid programs to which it submits drug reimbursement claims. In Massachusetts, for example, Omnicare has a provider agreement with MassHealth. Massachusetts regulations provide that: "All pharmacies participating in MassHealth must comply with the regulations governing MassHealth, including but not limited to MassHealth regulations set forth in 130 CMR 406.000 and 450.000." The Massachusetts regulation at 130 CMR 450.261 in turn provides: "All members and providers must comply with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, specifically including but not limited to 42 U.S.C. § 1320a-7b [the federal anti-kickback statute]."

### The Genesis Of The Kickback Agreement Between IVAX And Omnicare

14.     During 1998 and 1999, Omnicare's Director of Purchasing, Dan Maloney, and its Senior Vice President of Purchasing and Professional Services, Tim Bien, realized that the patents on many major branded drugs soon would be expiring, thereby permitting the entry of

6

generic competitors. Maloney and Bien also realized that a generic drug manufacturer might not want to incur the expense of introducing a new generic drug without confidence that the drug would have buyers. Because Omnicare itself was a large buyer of drugs, Maloney and Bien understood that a generic drug manufacturer would place value on having a future purchase commitment from Omnicare before launching a new generic drug. Maloney and Bien then set about trying to extract that value for Omnicare's benefit.

15.     In early 1999, Maloney had conversations with IVAX's Vice-President, Sales & Marketing, Kim West, about IVAX making a multi-million dollar payment to Omnicare in exchange for a commitment by Omnicare to purchase certain generic drugs that IVAX then was considering whether to introduce. Omnicare, having been induced to purchase drugs from IVAX, then could recommend those drugs to nursing home physicians and pass on the costs of the drugs to the nursing home patients' insurers, including Medicaid.

16.     In a letter dated May 24, 1999, as part of Omnicare's effort to make the business opportunity more attractive to IVAX, Maloney told West that Omnicare "currently has several Disease Management Programs and numerous Therapeutic Interchange Programs in place." Through the Disease Management Programs – nationwide programs in which Omnicare screened patients for various medical conditions – Omnicare could encourage physicians to prescribe more of the drugs that IVAX manufactured. Through the Therapeutic Interchange Programs – nationwide programs in which Omnicare sought physicians' approval to alter patients' drug regimens – Omnicare could encourage physicians to switch patients from other manufacturers' drugs to those that IVAX manufactured. In his May 24 letter, Maloney gave examples of drugs,

7

such as fluoxetine (the generic form of Prozac, an antidepressant drug), whose utilization

Omnicare could influence through these programs. Maloney explained that he wanted West to

"understand the opportunity [IVAX] has with Omnicare as we expand utilization of these

products through our formulary initiatives."

## The Negotiations Between Omnicare And IVAX

### May-June 1999

17.     By the spring of 1999, IVAX and Omnicare had reached agreement on the broad

outlines of a deal where, in exchange for Omnicare's commitment to purchase certain generic

drugs exclusively from IVAX for a period of years, IVAX would pay Omnicare a large "signing

bonus."

18.     The proposed deal with IVAX was very different from anything Omnicare had

done in the past. Nevertheless, 1999 was a difficult year for Omnicare in terms of earnings, and

the prospect of receiving a substantial upfront payment from IVAX that year was very attractive

to Omnicare's senior management.

19.     In late May 1999, Omnicare began seeking advice on the IVAX deal from a

health care attorney at a large national law firm. (This attorney is referred to hereinafter as

"Attorney #1".) Attorney #1 was Omnicare's regular outside counsel for transactional matters

involving potential health care fraud and abuse issues. Omnicare sought Attorney #1's advice on

whether the proposed signing bonus from IVAX could be characterized as a price "discount" that

8

would fall within the anti-kickback statute's discount exception, 42 U.S.C. § 1320a-7b(b)(3), or the regulatory safe harbor for discounts, 42 C.F.R. § 1001.952(h).

20.     In a 15-page memorandum dated June 7, 1999, Attorney #1 warned Omnicare that the proposed payment from IVAX would not fall within either the statutory discount exception or the regulatory discount safe harbor. The memorandum began by advising Omnicare that: "In summary, the proposed arrangement [with IVAX] carries a *heightened* risk that a federal or state prosecutor would determine it violates federal or state fraud and abuse statutes, specifically the federal anti-kickback statute." (Emphasis in original.) The memorandum noted that, in 1994, the Office of the Inspector General of the United States Department of Health and Human Services ("HHS-OIG") had issued a Special Fraud Alert warning that a payment from a drug company could violate the anti-kickback statute if it was "offered to . . . suppliers (including pharmacies . . .) in exchange for, or based on, . . . providing specific prescription products." Attorney #1's memorandum then concluded that:

> The primary issue is that the proposed arrangement, on its face, has all the characteristics of a kickback. It involves a lump-sum cash payment (the stated "signing bonus") intended as an incentive to win Omnicare's business.

21.     On June 8, 1999, Attorney #1 discussed his memorandum in a conference call with several Omnicare executives and an accountant from Omnicare's outside accounting firm, PricewaterhouseCoopers ("PWC"). PWC was involved because Omnicare was trying to determine if it could recognize revenue on the proposed IVAX signing bonus payments in 1999, before Omnicare made any drug purchases from IVAX. Omnicare, through its executives, understood from this conversation and other information that there was a conflict between the

9

company's desire to book revenue early and Attorney #1's legal advice that any payments by IVAX be tied more closely to actual purchases of product.

### July 1999

22.     After receiving Attorney #1's June 7 memo, Omnicare continued its discussions with IVAX. On July 9, 1999, IVAX's Kim West faxed a new term sheet to Omnicare's Dan Maloney. An internal IVAX draft of this term sheet stated that the proposed contract's purpose was "[t]o induce Omnicare to purchase new [IVAX] products." The term sheet IVAX actually sent to Omnicare stated that the purpose of the proposed contract was "[t]o promote Omnicare usage of new [IVAX] products."

23.     The term sheet contained, inter alia, the following provisions:

- Omnicare and IVAX would enter into a three-year agreement with a term from January 1, 2000, through December 31, 2002.

- Omnicare would agree to make $50 million in generic drug purchases from IVAX during the contract term.

- Omnicare would commit to purchase six new generic products exclusively from IVAX during the contract term. These drugs were: fluoxetine (Prozac), omeprazole (Prilosec), famotidine (Pepcid), buspirone (Buspar), terazosin (Hytrin), and enalapril (Vasotec).

- IVAX would pay Omnicare $8 million in fixed amounts, including $2.5 million in 1999, $3 million in 2000, and $2.5 million in 2001.

10

- In the event that Omnicare did not meet the $50 million purchase target, Omnicare would ratably refund the $8 million.

- IVAX also would pay Omnicare a 5% post-purchase rebate based on Omnicare's actual purchases of IVAX drugs during each quarter of the contract term.

24.     On July 13, 1999, West faxed Maloney a slightly revised term sheet. Omnicare faxed IVAX's July 13 term sheet to Attorney #1 and again asked for his advice. On July 21, 1999, Attorney #1 faxed a new memo to Omnicare. Much like his prior memo, Attorney #1's July 21 memo on the IVAX term sheet began with strong cautionary language: "In summary, the proposed arrangement [with IVAX] carries a *significant* risk that a federal or state prosecutor would determine it violates federal or state fraud and abuse statutes, specifically the federal anti-kickback statute." (Emphasis in original.)

25.     The July 21 memo observed that the arrangement provided for payments by IVAX to Omnicare a year or more in advance of any corresponding purchases by Omnicare. Accordingly, Attorney #1 warned that, "Because money has a time-value, the Office of Inspector General might interpret this payment as a loan [i.e., not a discount] or simply question the nexus between the payment and the sale." To ameliorate this concern, Attorney #1 proposed specific contract language pursuant to which, inter alia, (1) Omnicare would not have an obligation to purchase any products exclusively from IVAX, and (2) IVAX would make its $8 million in payments quarterly over the full three-year term of the contract, beginning with a payment of $833,000 at the end of the fourth quarter of 1999.

11

**August-September 1999**

26.     On August 24, 1999, IVAX sent Omnicare a draft contract. The IVAX draft was consistent with IVAX's July term sheets. Among other things, the draft contract provided that IVAX would make $2.5 million in payments to Omnicare in 1999, beginning in August, even though Omnicare would not be making any purchases under the agreement until at least January 1, 2000.

27.     On August 31 and September 9, 1999, Attorney #1 spoke to IVAX's Associate General Counsel concerning the fraud and abuse issues raised by the proposed contract between Omnicare and IVAX.

28.     On September 13, 1999, Attorney #1 sent Omnicare a new memo with revised contract language that he was proposing. Attorney #1 explained that he was "attempting to provide Omnicare with guidance on how it might come closer to achieving its discount objectives with [IVAX] within parameters that present a low risk of implicating the federal anti-kickback statute." If Omnicare and IVAX had adhered to Attorney #1's advice, IVAX could not pay, and Omnicare could not receive or recognize as revenue, $2.5 million in 1999, since the parties did not contemplate that Omnicare would buy any drugs from IVAX in 1999. Attorney #1 explained:

> [W]e do not believe Omnicare, nor [IVAX], based upon recent discussions with its Associate General Counsel, would want to be in the position of defending a $2.5 million cash payment as a prepaid rebate which did not cover a rebate period, and the rebate period (for which purchases were required), did not begin until several months after the cash payment was received. As we explained in an earlier memorandum, we believe the OIG could challenge this advance cash

12

payment, for which there is no safe harbor, as a "signing bonus," and/or an interest free loan.

29. Neither Omnicare nor IVAX consulted further with Attorney #1 on their proposed contract.

## The Finalization Of The Parties' Kickback Arrangement

30. Notwithstanding Attorney #1's repeated warnings, Omnicare still sought the $2.5 million that IVAX was offering to pay it in 1999, and IVAX still sought a purchase commitment from Omnicare.

31. On October 25, 1999, Omnicare's Tim Bien sent a handwritten note to several Omnicare senior executives, including the company's Chief Executive Officer, Joel Gemunder. The note concerned the status of several types of revenue Bien was hoping that Omnicare could recognize in 1999. With respect to IVAX, Bien wrote:

If we get the . . . ruling in our favor it will mean an additional $2,500[,000] in rebates in 1999. Negotiated -- held up by legal.

32. Having received advice from Attorney #1 that did not suit its financial goals, Omnicare sought a second legal opinion from another attorney (referred to hereinafter as "Attorney #2") whom Omnicare had not previously consulted on fraud and abuse issues. Omnicare did not tell Attorney #2 that another attorney already had considered the IVAX deal and had advised Omnicare not to proceed with it. Moreover, in seeking the second opinion, Omnicare falsely represented to Attorney #2 that Omnicare and IVAX intended the $8 million in upfront payments to function solely as a discount on the purchase of $50 million of products. Omnicare did not disclose to Attorney #2 that the parties' main purpose from the outset of the

13

negotiations was for IVAX to pay Omnicare a large "signing bonus." Omnicare also did not disclose to Attorney #2 that it sought the upfront money from IVAX so that it could recognize revenue on the IVAX contract in 1999.

33. Ultimately, Attorney #2 provided Omnicare with an opinion that "it is more likely than not that the $8 million [from IVAX] will be viewed as a discount on the purchase of $50 million of products." At no point, however, either before or after receiving this second opinion, did Omnicare tell Attorney #2 about the legal and factual issues that had led Attorney #1 to conclude that the proposed deal with IVAX was unlawful. Omnicare thus had reason to know that it could not reasonably rely on Attorney #2's opinion because the attorney had not addressed fundamental issues concerning the proposed deal and was misinformed about its true purpose.

34. In November and December, Omnicare and IVAX made minor revisions to their proposed contract. At Omnicare's request, the parties back-dated the contract's effective date to April 1, 1999, so that the entire contract would have a 45-month term. Omnicare did this for purposes of revenue recognition. Omnicare intended to prorate the $8 million in payments from IVAX over the period from April 1, 1999, through December 31, 2002, in its financial statements. Omnicare believed that the back-dating of the contract would legitimize its recognition of approximately $1.6 million in revenue in 1999, even though Omnicare still would not begin purchasing drugs from IVAX until 2000.

35. Omnicare and IVAX signed their contract on December 21, 1999. In the contract, Omnicare agreed, inter alia, that, during the period from January 1, 2000, through December 31,

14

2002, Omnicare would purchase six generic drugs exclusively from IVAX and would purchase at least $50 million in drugs altogether from IVAX. In exchange, IVAX agreed, inter alia, that it would make a total of $8 million in quarterly payments to Omnicare through the end of 2001, with the first payment of $2.5 million due on or before December 31, 1999, even though Omnicare would not purchase any drugs from IVAX in 1999.

36.     On December 21, 1999, the day the parties signed their contract, IVAX issued a $2.5 million check to Omnicare. Over the course of 2000 and 2001, IVAX made an additional $5.5 million in payments to Omnicare. IVAX described the purpose of the payments internally as "purchase commitment" and "volume incentive."

37.     In its own internal accounts, IVAX did not allocate its $8 million in payments to reduce the effective prices of the drugs it sold to Omnicare, but rather treated the payments as a reduction in overall profit. Thus, with respect to the payments, IVAX instructed its financial analyst: "Do not factor into price or revenue, take off total profit line." IVAX later described the payments internally as "upfront money" and "non-product specific."

38.     By the end of 2000, Omnicare had purchased only $5.5 million in drugs from IVAX under the contract. In June 2001, the parties agreed that they would extend the deadline by which Omnicare would be required to purchase at least $50 million in drugs from IVAX from December 31, 2002, to December 31, 2003.

39.     By the end of 2003, Omnicare had purchased only $44 million in drugs from IVAX under the contract. On February 5, 2004, after the first extended contract term had

15

expired, the parties signed an amendment retroactively extending the contract through June 30, 2004.

40.     By June 30, 2004, Omnicare had purchased over $50 million in drugs from IVAX under the contract. Omnicare delivered those drugs to patients in long term care facilities. When those patients had drug insurance coverage from Medicaid, Omnicare submitted reimbursement claims to Medicaid for the IVAX drugs that it delivered to those patients.

## False Claims

41.     All of the thousands of claims that Omnicare submitted, or caused to be submitted, to Medicaid for drugs purchased from IVAX during the period from January 1, 2000, through June 30, 2004, were false or fraudulent due to the illegal kickbacks that IVAX paid to induce Omnicare to make those purchases for patients insured by Medicaid. Examples of such false or fraudulent claims include the following claims submitted to MassHealth:

| Patient | Drug | Date Submitted | Amount Paid |
|---------|------|----------------|-------------|
| A | Fluoxetine | June 2, 2004 | $8.12 |
| B | Famotidine | May 16, 2003 | $8.18 |
| C | Enalapril | April 19, 2004 | $13.27 |
| D | Buspirone | January 28, 2004 | $31.48 |

16

## Count One
## (False Claims Act: Presentation Of False Claims, 31 U.S.C. § 3729(a)(1); Against Omnicare, Inc.)

42.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

43.     As a result of Omnicare's solicitation and receipt of IVAX's $8 million in kickback payments to induce Omnicare to purchase, order, or recommend or arrange for the purchasing or ordering of drugs manufactured by IVAX, in violation of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(1), all of the claims to Medicaid for those drugs were false or fraudulent. Accordingly, Omnicare knowingly presented, or caused to be presented, false or fraudulent claims to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

44.     By virtue of the false or fraudulent claims Omnicare presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count Two
## (False Claims Act: Presentation Of False Claims, 31 U.S.C. § 3729(a)(1); Against IVAX Pharmaceuticals, Inc.)

45.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

46.     As a result of IVAX offering and making $8 million in kickback payments to Omnicare to induce Omnicare to purchase, order, or recommend or arrange for the purchasing or ordering of drugs manufactured by IVAX, in violation of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), all of the claims to Medicaid for those drugs were false or fraudulent.

17

Accordingly, IVAX knowingly caused the presentation of false or fraudulent claims to officials of the United States in violation of 31 U.S.C. § 3729(a)(1).

47.     By virtue of the false or fraudulent claims IVAX knowingly caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count Three
### (False Claims Act:  Making Or Using False Records Or Statements To Cause Claims To Be Paid, 31 U.S.C. § 3729(a)(2); Against All Defendants)

48.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

4.     Omnicare and IVAX knowingly made, used, or caused to be made or used, false records or statements to cause false or fraudulent claims to be paid or approved by the United States.  The false records or statements were the false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the anti-kickback statute, 42 U.S.C. § 1320a-7b, that Omnicare made or caused to be made in agreements with state Medicaid programs when seeking to ensure that Medicaid would reimburse for the drugs that Omnicare purchased from IVAX.

49.     By virtue of the false records or statements Omnicare and IVAX made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

18

## Count Four
### (False Claims Act: Conspiracy To Submit False Claims, 31 U.S.C. § 3729(a)(3); Against All Defendants)

50. Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

51. Omnicare and IVAX conspired with each other to arrange for IVAX to make $8 million in kickback payments to Omnicare to induce Omnicare to purchase, order, or recommend or arrange for the purchasing or ordering of drugs manufactured by IVAX, in violation of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), thereby causing all of Omnicare's claims to Medicaid for those drugs to be false or fraudulent. According, each of the defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid.

52. By virtue of the false or fraudulent claims defendants conspired to get allowed or paid, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## Count Five
### (Unjust Enrichment And Disgorgement; Against Omnicare, Inc.)

53. Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

54. This is a claim for the recovery of monies by which Omnicare has been unjustly enriched.

55. By directly or indirectly obtaining government funds to which it was not entitled, Omnicare was unjustly enriched, and is liable to account for and to disgorge such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

19

## Count Six
## (Payment By Mistake; Against Omnicare, Inc.)

56.     Plaintiff United States repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

57.     This is a claim for the recovery of monies paid by the United States to Omnicare as a result of mistaken understandings of fact.

58.     The false claims that Omnicare presented to the United States were based upon mistaken or erroneous understandings of material fact.

59.     The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid Omnicare, directly or indirectly, certain sums of money to which Omnicare was not entitled, and Omnicare is thus liable to account for and to pay such amounts to the United States.

## Prayer For Relief

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

1.     On Count One under the False Claims Act, against Omnicare, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

2.     On Count Two under the False Claims Act, against IVAX for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

3.     On Counts Three and Four under the False Claims Act, against all defendants, for

the amount of the United States' damages, trebled as required by law, and such civil penalties as

are required by law, together with such further relief as may be just and proper.

4.     On Counts Five and Six, against Omnicare for unjust enrichment and payment by

mistake, for the damages sustained and/or amounts by which Omnicare was unjustly enriched or

by which Omnicare retained illegally obtained monies, plus interest, costs, and expenses, and

such further relief as may be just and proper.

## Demand for Jury Trial

The United States demands a jury trial in this case.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

MICHAEL J. SULLIVAN
United States Attorney

Dated: March 4, 2009            By:

GREGG SHAPIRO
CHRISTINE WICHERS
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

JOYCE R. BRANDA
DANIEL R. ANDERSON
LAURIE A. OBEREMBT
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

21